## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

                                                    Crim. No. 15-164 (DSD/BRT)

             Plaintiff,

v.

                                       **REPORT AND**

Houston Oliver (1),                      **RECOMMENDATION**
James Green (2),

             Defendants.

---

LeeAnn K. Bell, Esq., United States Attorney's Office, counsel for Plaintiff.

Larry E. Reed, Esq., Reed Law Offices, counsel for Defendant Oliver.

DeAundres D. Wilson, Esq., Wilson Law Office, PA, counsel for Defendant Green.

---

BECKY R. THORSON, United States Magistrate Judge.

      Defendants Houston Oliver and James Green have, along with Desmond Williams, been indicted for conspiring to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Oliver now moves to suppress six kilograms of cocaine, five cell phones, and assorted documentary evidence seized during the execution of separate search warrants for his residence, hotel room, BMW, and other properties. (*See* Doc. No. 74, Oliver's Am. Mot. to Suppress; Doc. No. 99, Oliver's Mem. in Supp. of Mot. to Suppress.) He contends that the narcotics were the fruit of an unlawful roadside stop, search, and seizure of his BMW; that the warrants to search the various premises and cell phones are facially invalid because the supporting affidavits did not provide probable cause to believe that

contraband or evidence of crime would be found in those locations; and that officers exceeded the scope of the search warrant for his hotel room when they seized the five cell phones, none of which were specifically mentioned in the warrant. (*See* Doc. No. 99 at 1–17, 27–28, 30–32.) Oliver has also moved for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge alleged omissions or misrepresentations contained in the affidavits used to secure the search warrants. (Doc. No. 103, Oliver's Mot. for a Franks Hr'g; Doc. No. 104, Oliver's Mem. in Supp. of Mot. for a Franks Hr'g.) Green, for his part, moves to suppress both the cell phone seized incident to his arrest, claiming that the arrest was not supported by probable cause, and his subsequent statements to the police, claiming that the interrogating officers failed to honor the invocation of his right to remain silent. (*See* Doc. No. 54, Green's Mot. to Suppress Evid.; Doc. No. 55, Green's Mot. to Suppress Statements; Doc. No. 81, Green's Suppl. Mot. to Suppress Evid.; Doc. No. 100, Green's Mem. in Supp. of Mot. to Suppress Evid.)

An evidentiary hearing on the suppression motions was held on August 25, 2015, during which the government introduced the relevant search warrants; video recordings of the roadside stop, search, and seizure of Oliver's BMW; and the testimony of Minnesota State Trooper Megan Thul and Minneapolis Police Officer Danielle Evans. (*See* Doc. Nos. 92, 107.) Based on the evidence presented at the hearing, and for the reasons detailed below, this Court recommends that Oliver's motions to suppress and for a *Franks* hearing, as well as Green's motions to suppress evidence and statements, be denied.

# I. FACTUAL HISTORY

On November 25, 2014, Sergeant John Biederman of the Minneapolis Police Department was contacted by a longtime confidential informant ("CI") and advised that Houston Oliver would be shipping cocaine from Arizona to Minneapolis via two-day priority mail. (*See* Doc. No. 92, 8/25/15 Hr'g, Gov't Ex. 2 at 2 & Gov't Ex. 6 at 2; Doc. No. 107, 8/25/15 Mot. Hr'g Tr. [hereinafter "Tr."] 78, 80.) The CI stated that Oliver had recently purchased cocaine and that, in the past, he had mailed cocaine packaged in silverware boxes from a particular post office in Maricopa, Arizona, with the help of James Green and Desmond Williams. (*See* Gov't Ex. 2 at 2; Tr. at 78–80, 104–05.) Given the CI's proven track record over the "last several years," which included supplying information that led to evidence, arrests, and felony convictions, Sergeant Biederman considered the information to be reliable and passed it along to Minneapolis Postal Inspector John Western. (*See* Gov't Ex. 2 at 2.)

Armed with the CI's information, Western intercepted two priority-mail packages shipped from Arizona to Minneapolis, one of which originated from the identified post office in Maricopa, and both of which were the same approximate weight and size and appeared to be addressed in identical handwriting. (*Id.*) After a trained canine alerted to the presence of narcotics, Western obtained a search warrant for the two packages on November 26, 2014, and soon discovered that each one contained approximately two kilograms of cocaine concealed inside a silverware box, just as the CI had predicted. (*Id.*; Tr. 79–80.)

Following the seizure of those four kilograms of cocaine, Sergeant Biederman and Minneapolis Police Officer Danielle Evans contacted Desmond Williams, who voluntarily came in for an interview on November 30, 2014. (*See* Gov't Ex. 2 at 2; Tr. 80–81, 105–06.) Biederman and Evans had over a decade of police experience each and were assigned to investigate weapons and narcotics offenses. (*See* Gov't Ex. 2 at 2; Gov't Ex. 6 at 2; Tr. at 74.) During his initial interview with the police, Williams corroborated the CI's information about the intercepted packages, admitted to mailing one of those packages, and indicated that Green had mailed the other one. (Tr. at 81; Gov't Ex. 2 at 2.) Williams also stated that he and Green were present when Oliver packaged the drugs at an Arizona home and that Oliver had supplied him with a cell phone to use for drug-related business. (*See* Tr. at 81, 108–09; Gov't Ex. 2 at 2; Gov't Ex. 6 at 2.)

Around the same time, the Minneapolis police received further information from the CI that Oliver was going to transport a large quantity of cocaine from Arizona to Minnesota in a gray BMW with Minnesota plates; the drugs were slated to arrive in Minneapolis on the night of November 30, 2014. (*See* Gov't Ex. 2 at 2; Tr. at 75, 81.) A check of Oliver's motor vehicle records confirmed that he owned a 2002 BMW 745li with Minnesota plates 672CAZ. (Gov't Ex. 2 at 2; Tr. at 82, 87.) Sergeant Biederman issued an alert that the BMW was suspected of transporting drugs; law enforcement officials, including Minnesota State Trooper Megan Thul, surveilled Interstate 35W in an effort to intercept the car. (Gov't Ex. 2 at 2; Tr. at 54, 60–61, 82.)

Shortly before 10:00 p.m. on November 30, 2014, Trooper Thul spotted the BMW on I-35W in Minneapolis, observed that it had illegally tinted windows, and proceeded to

4

stop the car.[1] (*See* Tr. at 54–55, 60–62, 64; Gov't Exs. 8–9.[2]) Although the BMW was registered to Oliver, a man named Sherrod Rowe was the driver and sole occupant of the car when Thul pulled it over. (*See* Tr. at 39, 54–55, 75; Gov't Ex. 2 at 2–3; Gov't Ex. 6 at 2.) Thul asked Rowe a series of routine questions for several minutes, including where he was coming from and going to, before returning to her squad car to conduct routine traffic checks. (*See* Tr. at 55, 62; Gov't Ex. 8.) Thul advised another officer on the scene, Bloomington Police Officer Christopher Wegner, that she was going to "start [Rowe's] warning so we're not detaining him any longer than necessary," at which point Wegner proceeded to question Rowe about his itinerary for several more minutes. (*See* Gov't Exs. 8–9.) In response to the officers' questions, Rowe stated that he had flown from Minnesota to Arizona a few days earlier, picked up Oliver's BMW, and then driven the car back to Minnesota, where he intended to phone Oliver to arrange for its delivery. (*See* Gov't Exs. 8–9; Gov't Ex. 2 at 2.)

Approximately twenty-five minutes into the traffic stop, and after he refused to consent to a search of the BMW, Rowe was removed from the car, handcuffed, and placed in the back of a squad car. (*See* Tr. at 56, 63, 66–67, 90; Gov't Ex. 8.) Officer

---

[1]     At the evidentiary hearing, Thul testified that officers had been directed to stop the BMW because it was believed to be involved in drug trafficking, but that she liked to "develop [her] own reasonable suspicion and probable cause" and stopped the BMW "based on the window tint violation" that she had observed. (Tr. at 54–55, 60–62.) Her subsequent police report stated that the BMW had a "very dark window tint" and that she "stopped the vehicle based on this violation." (*Id.* at 62.)

[2]     Video recordings of the traffic stop were captured by both Trooper Thul and Bloomington Police Officer Christopher Wegner; the two videos have been included in the record as government exhibits 8 and 9.

Evans, who was en route and in radio communication with the officers on the scene, determined that there was probable cause to impound the BMW based on the CI's corroborated statements and she directed officers to do so. (Tr. at 71, 82–83.) The officers told Evans that they intended to run a narcotics dog around the car before it was towed; although Evans was not herself interested in a canine search, she responded that conducting one would be fine because the BMW was going to be impounded regardless of what a dog sniff revealed. (*See id.* at 83, 93; Gov't Ex. 9.) While awaiting the arrival of the tow truck, officers conducted a brief search of the BMW's interior with the aid of a drug-sniffing dog, which alerted to the possible presence of narcotics inside a speaker in the trunk. (*See* Tr. at 66, 70–71, 93–94; Gov't Ex. 8.) At the evidentiary hearing, Officer Evans categorized the search as a routine inventory search for valuables, cash, and other items that "might be stolen or otherwise compromised by being in the impound lot." (Tr. at 84–85.) Nothing of value was uncovered or seized during the roadside search and, notwithstanding the canine alert, the BMW's speakers were not searched at that time. (*Id.*) The BMW was towed to an impound lot just under an hour after it was first stopped. (*See* Gov. Ex. 8.) The following day, December 1, 2014, Williams notified Sergeant Biederman that Oliver was "hysterical" over the fact that law enforcement had stopped his BMW and taken its driver into police custody. (*See* Gov't Ex. 2 at 2; Tr. at 99.)

On the morning of December 2, 2014, Sergeant Biederman secured a warrant to search Oliver's impounded BMW for narcotics, "[i]tems that show responsibility for narcotics" and "a connection between the narcotics or vehicle with an address or person," and "[d]ocuments, mailings, keys, address books, cell phones (and content), receipts,

bills, rental agreements, photographs, notes and other media." (Gov't Ex. 1 at 4–5.) Officers promptly executed the search warrant and found six kilograms of cocaine hidden inside a speaker in the trunk of the BMW, a receipt in Green's name for new tires purchased on November 28, 2014, a cell phone, and documents addressed to Oliver at particular addresses on Dupont Avenue North and Washington Avenue in Minneapolis. (*See id.* at 5; Gov't Ex. 2 at 2–3; Tr. at 100.) That was the first time that any contraband was actually found in and seized from the BMW. (Tr. at 84–85, 96–97, 99.)

Sergeant Biederman and Officer Evans then re-interviewed Williams, who indicated that Oliver had recently phoned him and, in coded language, stated that six bricks of cocaine were in the BMW when it was stopped. (Gov't Ex. 2 at 2; Tr. at 101– 02.) Williams also told the officers that Oliver lived in a home on Dupont Avenue North, owned a second-story loft on North Washington Avenue, owned another building on West Broadway Avenue where Green had been living, and was currently staying with his girlfriend in a Minneapolis hotel. (*See* Gov't Ex. 5 at 3.) Sergeant Biederman confirmed Oliver's connection to those properties and determined that his girlfriend had rented Room 134 at a Marriott Hotel. (*Id.*)

Later that day, Sergeant Biederman obtained four additional warrants to search Oliver's Dupont Avenue home, Washington Avenue loft, West Broadway Avenue building, and Marriott Hotel room for narcotics; cash and proceeds from the sale of narcotics; and documents, mailings, photographs, keys, address books, notes, receipts, ledgers, and "other media that shows standing at an address, responsibility for a vehicle, connections between persons, the location of the proceeds from the sale of narcotics, or

that a crime has been committed." (*See* Gov't Exs. 2–5.) The warrants for the addresses

on Dupont, Washington, and West Broadway Avenues also expressly authorized the

seizure of cell phones; the warrant for the Marriot Hotel room did not. (*See id.*).

Sergeant Biederman's affidavits in support of all four search warrants were

virtually identical and recounted the information provided by the CI; the CI's track record

over the last several years; Williams' statements and "confirm[ation] of the [CI's]

information concerning the packages being dropped off at the post office, the way they

were packaged, and those involved"; and the other investigative efforts corroborating the

CI's information, including the two packages of cocaine intercepted by postal inspectors,

the traffic stop of Oliver's BMW on November 30, 2014, and the subsequent recovery of

six kilograms of cocaine from the trunk. (*Id.*) The affidavits did not identify Williams by

name, instead describing him as "one of the people involved in dropping the packages off

at the post office" who had spoken to the police on November 30, December 1, and

December 2, 2014. (*See, e.g.*, Gov't Ex. 2 at 2–3.) They did, however, include Sergeant

Biederman's averment that, based on his training, experience, and conversations with

other officers, drug traffickers often keep relevant records, documents, and cash proceeds

in their homes, offices, and other premises that "they own or control." (*Id.* at 3; Gov't Ex.

3 at 3; Gov't Ex. 4 at 3; Gov't Ex. 5 at 3.) The state judge who issued the warrants found

probable cause to believe that the listed items were either contraband or would contain

evidence of a crime, and that they would be found in the premises under Oliver's control.[3] (*See, e.g.*, Gov't Ex. 2 at 5.)

Police officers executed the four premises warrants between 4:00 p.m. and 7:00 p.m. on December 2, 2014, beginning with the Marriott Hotel room. (*See id.* at 6; Gov't Ex. 3 at 6; Gov't Ex. 4 at 6; Gov't Ex. 5 at 6.) Oliver was in the hotel room at the time and placed under arrest. A search of his person incident to that arrest uncovered cash, an identification card, and some credit cards. (*See* Tr. at 33–34; Gov't Ex. 5 at 6.) Officers also seized five cell phones that were found on the bed in the hotel room, various documents, and a small amounted of suspected marijuana. (*See* Gov't Ex. 5 at 6; Gov't Ex. 6 at 2.) During the execution of the search warrants for Oliver's Dupont Avenue home and Washington Avenue loft, officers seized various documents, pieces of mail, a bank deposit bag, and a priority mail box. (Gov't Ex. 2 at 6; Gov't Ex. 4 at 6.) And from the West Broadway Avenue building owned by Oliver and occupied by Green, officers seized documents, two cell phones, and prescription bottles in Green's name. (Gov't Ex. 3 at 6; Gov't Ex. 6 at 2.) No narcotics or firearms were found at any of the four premises searched by the police. (*See* Tr. at 114.) Green was arrested at approximately 4:30 p.m., sometime during the search of Oliver's hotel room, and a cell phone was

---

[3]     The search warrants for the four premises were issued as no-knock warrants based on statements from the CI that Oliver had access to firearms and was capable of killing someone, the seriousness of the drug-trafficking crime that Oliver was suspected of committing, and Williams' statement that Oliver was "hysterical" about the interdiction of his BMW, all of which led Sergeant Biederman to believe that unannounced entries were necessary to prevent Oliver from "doing something drastic and violent to avoid apprehension." (*See, e.g.*, Gov't Ex. 2 at 4–5.)

seized incident to his arrest. (*See id.* at 110–11.) He was interviewed the following day, December 3, 2014, at the Hennepin County Jail by Sergeant Biederman and Officer Evans. (*See id.* at 111; Gov't Ex. 7.)

Nearly three weeks later, on December 23, 2014, Officer Evans secured a warrant to search the numerous cell phones recovered by the police during their investigation, including the cell phone seized incident to Green's arrest and the five cell phones found on the bed at the Marriott Hotel. (Gov't Ex. 6.) Evans' supporting affidavit detailed the narcotics investigation into Oliver, Green, and Williams, including the information supplied by the CI, the packages of cocaine intercepted by postal inspectors, Williams' statements that Oliver and Green were involved in the packaging and shipment of the cocaine, and the six kilograms of cocaine recovered from Oliver's BMW. (*Id.* at 2.) The affidavit also attested to the CI's reliability, noting that the informant had provided accurate information in the past which had led to "evidence, arrests and convictions." (*Id.*) Based on her fourteen years of experience as a police officer and conversations with other law enforcement officials, Evans averred that the cell phones might contain data relevant to the drug-trafficking investigation, including data showing that Oliver, Green, Williams, and Rowe had "been in communication with each other during relevant times in the drug conspiracy or otherwise know each other." (*Id.*) The state judge who issued the warrant found probable cause to believe that the cell phones were either used in the commission of a crime or would contain evidence tending to show that a crime had been committed. (*Id.* at 4.) While it is clear that the cell phones were searched pursuant to the

December 23, 2014 warrant, there is nothing in the record about the results of those searches. (*See id.* at 6.)

## II. Oliver's Motion to Suppress

In his post-hearing memorandum, Oliver seeks to suppress the narcotics, cell-phone data, and documentary evidence uncovered during the police investigation on three principal grounds.[4] First, Oliver contends that the cocaine recovered from his BMW was the fruit of an unlawful roadside stop, search, and seizure of the vehicle without a warrant or probable cause. (Doc. No. 99 at 1–8, 28–29.) Second, he challenges the facial validity of the warrants to search the various premises under his control, as well as the validity of the subsequent warrant to search the contents of the cell phones seized by the police. (*Id.* at 1–2, 11–17, 27, 31.) Third, he contends that the cell phones seized from his hotel room exceeded the scope of the relevant search warrant and were the fruit of his unlawful,

---

[4]     Throughout his post-hearing memorandum, Oliver invokes Minnesota law and cites the Supreme Court's decision in *Elkins v. United States*, 364 U.S. 206 (1960), for the proposition that evidence seized in violation of state law is not admissible in federal court. (*See* Doc. No. 99 at 20, 24–25.) As this Court previously explained to Oliver, "federal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as [the officers' actions] complied with the Fourth Amendment." (Doc. No. 96 at 15–16 n.2 (quoting *United States v. Bach*, 310 F.3d 1063, 1066 (8th Cir. 2002)); *see also United States v. Maholy*, 1 F.3d 718, 721 (8th Cir. 1993) ("When evidence obtained by state law enforcement officers is offered in a federal prosecution, the legality of the search and seizure is not determined by reference to a state statute [or state procedural rule], but rather is resolved by fourth amendment analysis."). Rather than contradicting this principle, *Elkins* supports it. *See* 364 U.S. at 223–24 ("[W]e hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures *under the Fourth Amendment* is inadmissible . . . . The test is one of *federal law*, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.") (emphasis added).

warrantless arrest. (*Id.* at 2, 10–11, 30–31.) Oliver also moves for a *Franks* hearing, claiming that the state judge who issued the warrants for his BMW, premises, and cell phones was misled by material omissions in the supporting warrant affidavits. (*See* Doc. Nos. 103–04.)

## A.    The Stop, Search, and Seizure of the BMW

Oliver first moves to suppress the six kilograms of cocaine seized from his BMW, claiming that it was the fruit of an unconstitutional roadside stop, search, and seizure of the vehicle without a warrant or probable cause. (Doc. No. 99 at 1–3, 28.) Oliver specifically challenges the justification, scope, and duration of the November 30, 2014 traffic stop of his BMW, arguing that the stop and questioning of the driver were unrelated to any window tint or other traffic violation but, in actuality, were directed at uncovering narcotics and justifying a search of the BMW. (*Id.* at 2–7.) Believing that the six kilograms of cocaine were actually discovered and seized prior to the December 2, 2014 search of his impounded BMW, Oliver maintains that the police attempted to retroactively legitimize the seizure by later obtaining a warrant to search the vehicle. (*Id.* at 7–8, 28–29.) The government responds that Oliver does not have standing under the Fourth Amendment to challenge the initial traffic stop of his BMW, as he was not in the car at the time, and that he has otherwise failed to meet his burden of showing that he has standing to challenge the roadside search and ultimate impoundment of the car. (Doc. No. 108, Gov't Resp. to Oliver's Mot. to Suppress 7–8.) Alternatively, the government argues that there was probable cause to justify the stop, search, and seizure of the BMW based on the information supplied by the CI, who had a track record of providing accurate

information to the police and whose information in this case was thoroughly corroborated. (*Id.* at 8–11.)

The Fourth Amendment protects persons against "unreasonable searches and seizures," and typically requires a warrant based on probable cause. U.S. Const. amend. IV. Searches and seizures conducted without a warrant are *per se* unreasonable unless they fall within an "established and well-delineated exception[]" to the Fourth Amendment's warrant requirement. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation omitted). Nevertheless, because "Fourth Amendment rights are personal and may not be vicariously asserted," *United States v. Ruiz-Zarate*, 678 F.3d 683, 689 (8th Cir. 2012), a defendant has no standing to "use the violation of another individual's rights as the basis for his own Fourth Amendment challenge," *United States v. Rodriguez-Arreola*, 270 F.3d 611, 616 (8th Cir. 2001). In addressing issues of Fourth Amendment standing, "it is important to distinguish between different government intrusions that implicate different constitutionally protected interests." *United States v. Powell*, 929 F.2d 1190, 1194 (7th Cir. 1991). For Fourth Amendment purposes, searches of places and things implicate an individual's reasonable expectation of privacy, while seizures of property entail "some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 446 U.S. 109, 113 (1984). Seizures of persons, by contrast, implicate an individual's freedom from physical restraint, *see Brendlin v. California*, 551 U.S. 249, 254 (2007), and traffic stops in particular implicate a person's "right to be free from random, unauthorized investigatory seizures," *United States v. Fuller*, 374 F.3d 617, 620 (8th Cir. 2004).

Here, Oliver has no standing to object to the investigatory traffic stop of his BMW, as he was not in the car at that time. Although Oliver is the registered owner of the BMW, "ownership of a vehicle is largely irrelevant to the question of whether a given defendant has standing to challenge the stop of that vehicle," *Powell*, 929 F.2d at 1194, because a traffic stop only implicates the occupants' rights to be "free from random, unauthorized investigatory seizures" and "does not significantly impair the interests of the person who lent the automobile" to a third party, *Fuller*, 374 F.3d at 620–21. Thus, in *United States v. Fuller*, the Eighth Circuit held that the owner of a vehicle driven by his stepson could not challenge the stop of that vehicle because the "right to be free from random, unauthorized investigatory seizures . . . . belong[ed] to the stepson" and the owner had no "reasonable expectation of a possessory interest" in the vehicle while it was in his stepson's possession. 374 F.3d at 620–21. Other courts have likewise held that "[v]ehicle owners absent at the time their vehicle is stopped cannot challenge the stop" because "[a] mere proprietary interest in the vehicle does not suffice for Fourth Amendment standing to challenge a traffic stop." *United States v. Gonzalez*, No. 13-cr-20813, 2014 WL 6606590, at *13 (E.D. Mich. Nov. 19, 2014); *see also Powell*, 929 F.2d at 1195 (holding that "a vehicle owner who is not in his car at the time it is stopped" generally lacks standing to challenge the stop because "the intrusion a vehicle stop causes is personal to those in the car when it occurs"); *United States v. Elmore*, 304 F.3d 557, 561 (6th Cir. 2002) (holding that the defendant did not have standing to object to a traffic stop because he was not in the vehicle at the time and the stop did not meaningfully interfere with any possessory interest that he had in the car). Accordingly, Oliver lacks

14

standing to challenge the traffic stop of his BMW, including the justification, scope, and duration of the stop, because it only implicated the Fourth Amendment rights of its driver and sole occupant, Sherrod Rowe.

While an absent owner's proprietary interest in a vehicle does not afford him standing to challenge an investigatory traffic stop of that vehicle, it may allow him to challenge a subsequent search and full-fledged seizure of the car depending on the particular facts of the case. *See Fuller*, 374 F.3d at 621 (differentiating between an absent owner's standing to challenge an investigatory stop of his vehicle, a search of that vehicle, and a "full-fledged seizure[]" of the vehicle); *Powell*, 929 F.2d at 1195–96 (similar); *Gonzalez*, 2014 WL 6606590, at *13 (explaining that while ownership does not confer standing to challenge the stop of a vehicle driven by another, "[n]o bright line rule exists regarding the standing of a vehicle owner to challenge the search of his vehicle").[5] Assuming, without deciding, that Oliver's ownership of the BMW gives him standing to challenge its roadside search and eventual seizure (*i.e.*, impoundment), those actions were

---

[5]    In *United States v. Gomez*, a case dealing with cocaine seized during a vehicle search, the Eighth Circuit explained that whether a defendant has standing to challenge a search and full-fledged seizure of property depends on several factors, including "ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." 16 F.3d 254, 256 (8th Cir. 1994). While Oliver relies on *Gomez* in asserting that he has standing to challenge not only the search and impoundment of his BMW, but of the initial traffic stop as well, that reliance is misplaced because *Gomez* did not deal with standing to challenge a traffic stop and the factors it articulated specifically relate to vehicle searches. (*See* Doc. No. 99 at 8–9.) Moreover, as the Eighth Circuit made clear in *Fuller*, an absent vehicle owner has no standing to challenge an investigatory stop of his car.

objectively justified under at least one of the established exceptions to the Fourth

Amendment's warrant requirement — the automobile exception.

Under the automobile exception, the police may search and seize a vehicle

without a warrant if they have probable cause to believe that contraband or evidence of a

crime will be found inside. *See California v. Acevedo*, 500 U.S. 565, 579–80 (1991);

*United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014); *United States v. Sims*, 424

F.3d 691, 693 (8th Cir. 2005). Because the subjective motives and intentions of officers

have no place in Fourth Amendment analysis, which asks only whether the officers'

actions were objectively reasonable, the validity of an automobile search does not depend

on whether "the ostensible ground for the search was different and improper" and the

existence of probable cause does not hinge "on what the particular officers involved

believed but on what a reasonable officer in their position would have believed." *United

States v. Cervantes*, 19 F.3d 1151, 1153–54 (7th Cir. 1994); *see also Brigham City, Utah

v. Stuart*, 547 U.S. 398, 404 (2006) (explaining that subjective motives and intent are

"irrelevant" because "[a]n action is reasonable under the Fourth Amendment, regardless

of the individual officer's state of mind, as long as the circumstances, viewed *objectively*,

justify the action") (quotations and brackets omitted) (emphasis in original); *McClendon

v. Story Cnty. Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005) ("[A]n officer's

subjective intent is never relevant under a Fourth Amendment analysis, so long as an

objective basis for the [challenged action] exists."). Probable cause exists when, under

the totality of the circumstances, "there is a fair probability that contraband or evidence

of a crime will be found in a particular place." *Vore*, 743 F.3d at 1179.

16

Before Oliver's BMW was even stopped on the interstate, the police had ample probable cause to believe that narcotics or other evidence of a drug-trafficking crime would be found in the vehicle, thus justifying the warrantless search and seizure of the car under the automobile exception. Where, as here, "probable cause depends on information supplied by an informant, the core question is whether the information is reliable." *United States v. Dukes*, 758 F.3d 932, 937 (8th Cir. 2014) (quotation and alterations omitted). Such information may be sufficiently reliable to establish probable cause where the informant has a "track record of providing accurate information," where his information is "at least partly corroborated" by the police, *or* where he has accurately predicated certain events. *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). All three indicia of reliability were present in this case. The police had received information from the CI that Oliver would be shipping cocaine packaged in silverware boxes from Arizona to Minnesota via two-day priority mail, that Green or Williams would likely mail those packages on Oliver's behalf, and that Oliver's gray BMW would be transporting a large quantity of cocaine to Minneapolis on the night of November 30, 2014. (*See* Tr. at 75–81, 104–05; Gov't Ex. 2 at 2; Gov't Ex. 6 at 2.) Not only did the CI have a track record of providing reliable information in the past, information that had led to evidence, arrests, and felony convictions, but the informant's information was independently corroborated by the police. (*See* Gov't Ex. 2 at 2.) Postal inspectors in Minneapolis had seized two packages of cocaine that largely fit the CI's description, including the particular Arizona post office where one of those packages was mailed from and the use of silverware boxes to conceal the drugs. (*See id.*; Tr. 79–80.) The

police also spoke with Williams, who confessed to sending one of those packages, stated that the intercepted drugs had been packaged by Oliver, and otherwise confirmed the CI's information. (*See* Tr. at 81; Gov't Ex. 2 at 2.) And as the CI predicted, Oliver's gray BMW arrived in Minneapolis on the night of November 30, 2014. *See United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995) (holding that an informant's information is sufficient to establish probable cause where the informant accurately predicts the time and place of certain events, even if those events are themselves innocent).

The CI's information, including that Oliver's BMW would contain a large amount of cocaine, was sufficiently reliable and more than adequate to provide probable cause to search the vehicle for narcotics or other evidence of drug trafficking.[6] And once, during the course of that search, the drug-sniffing dog alerted to the possible presence of narcotics hidden inside a speaker in the trunk, the police had even more cause to seize the BMW. Because the roadside search and seizure of Oliver's BMW were justified under the automobile exception to the Fourth Amendment's warrant requirement, the cocaine that was later found and seized on December 2, 2014, pursuant to a search warrant was

---

[6]     For similar reasons, even if Oliver had standing to challenge the initial traffic stop of the BMW, this Court would conclude that the stop was objectively justified based on reasonable suspicion that the vehicle was involved in drug trafficking. *See United States v. Farnell*, 701 F.3d 256, 261 (8th Cir. 2012) (explaining that an investigatory stop of a vehicle may be based on "reasonable suspicion that criminal activity is afoot," not only for a traffic violation). Trooper Thul's testimony that she stopped the vehicle for having illegally tinted windows in no way affects that conclusion, as "the constitutional reasonableness of a traffic stop does not depend on the actual motivations . . . [or] subjective intentions of the officer making the stop." *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007).

not the fruit of any prior illegality.[7] The narcotics and other evidence recovered from

Oliver's BMW are not subject to suppression under the Fourth Amendment.[8]

## B.   The Facial Validity of Premises and Cell Phone Warrants

Oliver next challenges the facial validity of the warrants to search his residence,

hotel room, and properties for narcotics, cash proceeds, documents, and other items

indicative of a drug conspiracy. (Doc. No. 99 at 1–2, 11–17, 26–27.) He contends that the

affidavits in support of those warrants did not provide probable cause to believe that

contraband or evidence of a crime would be found in those locations. (*Id.* at 15.) More

specifically, he maintains that the affidavits did not provide any indication as to the CI's

basis of knowledge or establish probable cause to believe that "any of the items noted in

the search warrants would be found at any of the various premises," as the affidavits

neither claimed that "anyone ever saw, or heard of controlled substances being at any of

---

[7]      The Court notes that, contrary to Oliver's assertions, the record evidence shows
that no drugs were actually discovered and seized from his BMW until after the police
had obtained a warrant to search the impounded car on December 2, 2014. (*See* Tr. at 84–
85, 96–97, 99.)

[8]      Because the search and seizure of the BMW were objectively justified under the
automobile exception, this Court need not decide whether they were also justified under
the inventory-search exception, as Officer Evans' apparently believed. *See United States
v. Arrocha*, 713 F.3d 1159, 1162–63 (8th Cir. 2013) (explaining that the inventory-search
exception allows officers to search and impound an automobile without either a warrant
or probable cause, so long as they are acting according to standardized police procedures
and on the basis of something other than suspicion of evidence of criminal activity).
Indeed, the government has not presented any evidence, including any written police
department policies, to show that the asserted inventory search and impoundment of the
BMW were conducted pursuant to standard police procedures. *See United States v.
Baldenegro-Valdez*, 703 F.3d 1117, 1126 (8th Cir. 2013) ("[T]o be constitutional, a
warrantless inventory search must be done pursuant to standard police procedures and for
the purpose of protecting the car and its contents.") (quotation and brackets omitted).

the locations," nor mentioned media, cell phones, documents, mail, or any other listed item.[9] (*Id.* at 11–12, 16, 21, 27.) Oliver also challenges the facial validity of the subsequent warrant to search the cell phones seized by the police, arguing that the supporting affidavit did not contain any "claim that the phones were utilized for any criminal activity." (*Id.* at 31.)

A search warrant must be based on a showing of probable cause, which exists when the supporting affidavit "sets forth sufficient facts to establish a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Darr*, 661 F.3d 375, 380 (8th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 238

---

[9]     Oliver further argues that the premises warrants should not have been issued as no-knock warrants because the supporting affidavits did not provide reasonable suspicion to believe that knocking and announcing the officers' presence would threaten officer safety or the preservation of evidence. (Doc. No. 99 at 22–24.) There is no need to address that argument because, as the Supreme Court has held, a violation of the Fourth Amendment's general knock-and-announce rule does not warrant the suppression of evidence. *See Hudson v. Michigan*, 547 U.S. 586, 599 (2006) (holding that "[r]esort to the massive remedy of suppressing evidence of guilt is unjustified" for knock-and-announce violations). In any event, Oliver's argument lacks merit. Given the overall reliability of the CI, the CI's statements that Oliver had access to firearms and was capable of killing someone, Williams' statement that Oliver was "hysterical" about the interdiction of his BMW, and the seriousness of the drug-trafficking offense that the police were investigating, there was reasonable suspicion to believe that abiding by the general knock-and-announce rule would pose threats to officer safety or of the destruction of evidence. *See United States v. Scroggins*, 361 F.3d 1075, 1081 (8th Cir. 2004). Contrary to Oliver's arguments, the fact that the warrant affidavits did not indicate how the CI knew that he had access to firearms or otherwise claim that he "possessed any firearms," "committed any violent acts with a firearm in the past," or "carried a weapon on his person" do not obviate a finding of reasonable suspicion. (*See* Doc. No. 99 at 23–24.) Reasonable suspicion is not a high standard; it simply requires a "particularized and objective basis" under the "totality of the circumstances" to believe that knocking and announcing would be "dangerous" or "would inhibit the effective investigation of the crime." *Scroggins*, 361 F.3d at 1081. That standard was met.

(1983)). The task of the issuing judge "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," such a fair probability exists. *Gates*, 462 U.S. at 238. While an informant's veracity and basis of knowledge are both relevant to the existence of probable cause, they are not "independent requirements to be rigidly exacted in every case"; instead, "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 230, 233. As previously noted, information supplied by an informant may be sufficiently reliable to support a finding of probable cause where the informant has a "track record of providing accurate information," where the information is "at least partly corroborated," or where he has correctly predicted certain events. *Winarske*, 715 F.3d at 1067.

As a reviewing court, the task of this Court is not to assess the sufficiency of the warrant affidavits *de novo*, but "simply to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 236, 238–39 (quotation and alterations omitted). That standard affords "great deference" to an issuing judge's probable-cause determination, one that demands interpreting the supporting affidavits with "commonsense" and not in a "grudging," "hypertechnical" fashion. *Id.* at 236.

Applying that deferential standard, this Court concludes that the affidavits in support of the premises warrants provided a substantial basis for concluding that Oliver was involved in drug trafficking and, by extension, that narcotics or other evidence of

21

that crime would be found in his Dupont Avenue home, Washington and Broadway

Avenue buildings, and Marriott Hotel room. Sergeant Biederman's supporting affidavits,

all of which were virtually identical, recounted the information provided by the CI; the

CI's track record of providing reliable information in the past; and the investigative

efforts corroborating the CI's information, including the packages of cocaine intercepted

by postal inspectors and the additional six kilograms of cocaine found in Oliver's BMW.

(*See, e.g.*, Gov't Ex. 5 at 2.) The affidavits further indicated that "one of the people

involved in dropping the [intercepted] packages off at the post office" (*i.e.*, Williams) had

"confirmed the [CI's] information concerning the [intercepted] packages" and indicated

that Oliver had packaged the cocaine, knew about the six kilograms of cocaine that were

being transported in his car, and owned or occupied the various premises. (*Id.* at 2–3.)

Biederman also averred, based on his "training, experience, and . . . conversations with

other law enforcement officers," that drug traffickers often keep "proceeds of their

narcotics sales" and "records and documents concerning their travels, vehicles,

associates, and real estate" in their homes, offices, and other locations "that they own or

control." (*Id.* at 3.)

The information contained in Sergeant Biederman's affidavits was more than

adequate to support the issuing judge's findings that probable cause existed to believe

that the items listed in the search warrants, including narcotics, documents, mailings,

address books, cell phones, and other media, would contain evidence of a drug

conspiracy and would be found in the locations owned or occupied by Oliver. *See United*

*States v. Luloff*, 15 F.3d 763, 768 (8th Cir. 1994) (holding that information that the

defendant was involved in drug trafficking, coupled with an officer's "averment based upon his experience that drug traffickers often keep in their residences records of their illicit activity," provided a substantial basis for finding probable cause to search the defendant's residence). Contrary to Oliver's arguments, the fact that the affidavits did not indicate that anyone actually observed narcotics at the locations or specifically mention several of the items listed in the warrants is not fatal to the existence of probable cause. Probable cause, as its very name implies, deals with probabilities based on reasonable, commonsense inferences, not with certainties about the incriminating nature of items or whether they are actually located in a particular place. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (explaining that probable cause requires only a "reasonable ground for belief" based on probabilities, not the level of proof "which would justify condemnation") (quotation omitted); *Hannah v. City of Overland, Mo.*, 795 F.2d 1385, 1389 (8th Cir. 1986) ("The probability, and not a prima facie showing, of criminal activity is the standard of probable cause.") (quotation and brackets omitted); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir. 1999) ("[I]n issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept . . . and . . . in the case of drug dealers evidence is likely to be found where the dealers live.") (quotation and emphasis omitted); *United States v. Williams*, 974 F.2d 480 (4th Cir. 1992) (holding that an affidavit showing that the defendant was a drug dealer and was currently residing in a motel room was sufficient to establish probable cause to search the motel room for drug paraphernalia, even though the affidavit did not contain any facts that such paraphernalia was located there). Moreover, some of the items that

Oliver claims were not mentioned in the warrant affidavits (*e.g.*, cell phones) were, in fact, mentioned.[10]

Neither is it fatal to the existence of probable cause that the affidavits did not specifically identify the CI's basis of knowledge. As noted, an informant's reliability, veracity, and basis of knowledge "are not entirely separate and independent requirements to be rigidly exacted in every case." *United States v. Stevens*, 530 F.3d 714, 717 (8th Cir. 2008) (quoting *Gates*, 462 U.S. at 230). The "core question" in assessing probable cause based on information supplied by an informant is simply "whether the information is reliable," which, for the reasons already explained, it was. Furthermore, an informant's basis of knowledge need not be expressly outlined in a warrant affidavit, as such a basis may be inferred from the level of detail provided by the informant. *See Spinelli v. United States*, 393 U.S. 410, 416 (1969) (explaining that where an informant's tip describes a suspect's activities "in sufficient detail," an issuing judge may "reasonably infer that the informant gained his information in a reliable way"), *abrogated on other grounds by Gates*, 462 U.S. 213. The wealth of details provided by the CI, including the precise post office where one of the intercepted packages was mailed from, the use of silverware

---

[10]     Sergeant Biederman's affidavits noted that, following the stop of Oliver's cocaine-laden BMW, Rowe stated that he intended to phone Oliver when he arrived in Minneapolis to return the vehicle and Williams stated that Oliver had phoned him to say that the BMW contained six bricks of cocaine. (*See, e.g.*, Gov't Ex. 2 at 2–3.) Those statements, not to mention the fact that cell phones are well-known tools of the drug trade, provided substantial grounds for believing that Oliver had used cell phones for drug-trafficking purposes and that the phones would be located in one or more of the properties under his control. *See United States v. Lazcano-Villalobo*s, 175 F.3d 838, 844 (10th Cir. 1999); *United States v. De La Cruz*, 996 F.2d 1307, 1311 (1st Cir. 1993).

boxes to conceal the mailed cocaine, and the fact that Oliver's gray BMW would be arriving in Minneapolis with cocaine in tow on the night of November 30, 2014, was sufficient to establish a basis of knowledge. (*See* Gov't Ex. 5 at 2.)

Oliver's challenge to the validity of the warrant to search the cell phones seized by the police fails for similar reasons. Officer Evans' affidavit in support of that search warrant also recounted the information obtained from the CI, the ten kilograms of cocaine that had been seized from the intercepted packages and Oliver's BMW, and Williams' statements that Oliver had packaged the intercepted cocaine and had supplied him with a phone "to conduct narcotics related business over." (Gov't Ex. 6 at 2.) That information, coupled with the fact that cell phones are recognized tools of the drug trade, provided sufficient grounds to believe that evidence relating to a drug conspiracy would be found on the cell phones seized from the suspected conspirators, Oliver included. *See Lazcano-Villalobo*s, 175 F.3d at 844 ("[C]ellular telephones are recognized tools of the drug-dealing trade."); *De La Cruz*, 996 F.2d at 1311 (describing cell phones as "well known tools of the drug trade").

## C.      Entitlement to a *Franks* Hearing

In addition to attacking the facial validity of the search warrants involved in this case, Oliver seeks to delve behind the surface to challenge specific statements or omissions in the warrant affidavits in a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). (Doc. No. 103.) To warrant a *Franks* hearing, a defendant must make "a substantial preliminary showing" that the affiant made "a false statement knowingly and intentionally, or with reckless disregard for the truth," and that "the allegedly false

statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56.

When alleged omissions are involved, a defendant must show that the affiant "omitted

facts with the intent to make, or in reckless disregard of whether they thereby made, the

affidavit misleading" and that "the affidavit if supplemented by the omitted information

would not have been sufficient to support a finding of probable cause." *United States v.

Jacobs*, 986 F.2d 1231, 1234 (8th Cir. 1993) (quoting *United States v. Reivich*, 793 F.2d

957, 960 (8th Cir. 1986)). For an omission itself to support an inference of recklessness

or intent to deceive, the omitted information must be "clearly critical to the finding of

probable cause." *Id.* (quotation omitted). In addition, allegations of deliberate falsehoods

or omissions are not alone sufficient to warrant a *Franks* hearing; those allegations "must

be accompanied by an offer of proof" such as "[a]ffidavits or sworn or otherwise reliable

statements of witnesses." *Franks*, 438 U.S. at 171.

Oliver contends that the state court judge who issued the warrants to search his

BMW, residence, hotel room, and other properties was misled by several omissions in the

supporting affidavits. First and foremost, he maintains that the affidavits failed to disclose

that the cooperating witness (*i.e.*, Williams) and the CI were the same person and that

Williams had personally mailed four kilograms of cocaine to Minnesota, not just the two

identified in the affidavits. (Doc. No. 104 at 3–11; *see also* Doc. No. 99 at 17–20.) Oliver

maintains that these omissions materially misrepresented Williams' true role in the drug

conspiracy and underlying motives for assisting the police by portraying him as an

innocent tipster, rather than someone who "was cooperating with the police in an effort to

extricate himself from the situation" after he was caught shipping drugs. (Doc. No. 104 at 3–5, 7, 11; *see also* Doc. No. 99 at 17–19.)

The ostensible omissions cited by Oliver are either unsupported by any evidence in the record or affirmatively belied by the record. This is not the first time that Oliver has pressed the theory that Williams and the CI are the same person. When Oliver raised that theory in a recent, unsuccessful bid to compel disclosure of the CI's identity, this Court rejected it as "mere speculation," explaining that the warrant affidavits, Officer Evans' hearing testimony, and the government's representations at the hearing all indicated that Williams and the CI are separate people. (Doc. No. 96 at 8–9.) The warrant affidavits clearly distinguish between the CI, who over the span of "several years" had supplied reliable information to the police and "provided names of individuals who they believed had dropped the cocaine off at the post office for Oliver," and the cooperating witness who was "one of the people involved in dropping the packages off at the post office" and "confirmed the [CI's] information." (*See, e.g.*, Gov't Ex. 2 at 2.) At the evidentiary hearing, Officer Evans identified Williams as the cooperating witness and her testimony, like the warrant affidavits, clearly distinguished between Williams and the CI. Officer Evans, for example, testified that "the [CI] provided information that Desmond Williams and Jimmy Green were possibly involved in mailing the packages," a sentiment that she later reiterated on cross-examination. (Tr. at 79, 104–05.) In fact, when Oliver's attorney questioned Officer Evans about whether particular information was provided by the CI or Williams, Evans replied, "[t]he [CI] indicated that." (*Id.* at 114.)

Despite the absence of any new evidence to suggest that Williams and the CI are the same person, Oliver persists in pressing that speculative theory, largely on the basis of the warrant affidavits' reference to "[t]his CRI" in a paragraph immediately following a description of Williams' interview on November 30, 2014. (Doc. No. 104 at 3–4; *see also* Doc. No. 99 at 18.) In isolation, that phrase might well support an inference that Williams and the CI are one and the same. But when viewed in the context of the affidavits as a whole, not to mention the government's representations[11] and Officer Evans' testimony at the evidentiary hearing, the admittedly ill-advised use of the pronoun "this" does not provide a substantial preliminary basis for concluding that Williams and the CI are the same person.[12]

Oliver's contention that the warrant affidavits misrepresented Williams' actual role in the drug conspiracy is also unsupported by the record. The affidavits did not, as Oliver maintains, mischaracterize the cooperating witness (*i.e.*, Williams) as an innocent party with no ulterior motive for assisting the police with their investigation. Instead, the affidavits repeatedly refer to him as "one of the people involved in dropping the [intercepted] packages [of cocaine] off at the post office" for Oliver. (*See, e.g.*, Gov't Ex. 2 at 2–3.) Nor did the affidavits minimize Williams' known role in the drug conspiracy

---

[11]     *See* Doc. No. 85 at 7–8; Doc. No. 108 at 22–23; Tr. at 18–19.

[12]     In a self-contradictory turn, Oliver, after arguing at length that Williams and the CI are the same person, maintains that the affidavits misrepresented Williams as the CI. (Doc. No. 104 at 10; *see also* Doc. No. 99 at 18.) Notwithstanding the inherent contradiction between those two positions, Oliver's argument is belied by the very terms of the warrant affidavits, which clearly distinguish between Williams and the CI.

by indicating that he had mailed only one of the two intercepted packages of cocaine. While Oliver cites Officer Evans' hearing testimony and Williams' recent plea agreement as proof that Williams sent a total of four kilograms of cocaine to Minnesota, neither source actually supports his position. (*See* Doc. No. 104 at 3, 5–7.) At the evidentiary hearing, Officer Evans, consistent with the information contained in the warrant affidavits, testified that each of the intercepted packages contained two kilograms of cocaine, for a total of four kilograms, and that Williams told the police that "Jimmy Green had mailed one of the packages . . . and that he mailed the other package of cocaine." (Tr. at 79–81.) And Williams' recent plea agreement, consistent with both the warrant affidavits and Officer Evans' testimony, likewise indicates that he only mailed one of the two intercepted packages. In his plea agreement, as well as at his plea hearing, Williams admitted that he conspired with Oliver and Green to distribute cocaine and that, "on at least one occasion in November 2014," he and Green had each mailed a package containing two kilograms of cocaine to Minnesota. (Doc. No. 84 at 2; Doc. No. 95 at 12.) Williams' acknowledgement that he was "responsible for conspiring to distribute at least 4 kilograms of cocaine *as part of the conspiracy*" was not an admission that he personally mailed the two intercepted packages to Minnesota, as Oliver insists, but a reflection of the established legal principle that a single conspirator is responsible for the known or foreseeable actions of his co-conspirators. (*See* Doc. No. 84 at 2) (emphasis added); *United States v. Correa-Santos*, 785 F.3d 307, 310 (8th Cir. 2015) (explaining that a single defendant in a drug conspiracy case is responsible for any drugs "in which the defendant was not directly involved" so long as "the transaction or activity involving

those drugs was in furtherance of the conspiracy" and was "either known to that

defendant or reasonably foreseeable to him"); *United States v. Yellow Horse*, 774 F.3d

493, 496 (8th Cir. 2014) (same).

Aside from the alleged and unsupported omissions concerning Williams, Oliver

also contends that the state judge was specifically misled when issuing the search warrant

for his BMW because the supporting affidavit did not mention that the vehicle had been

stopped, searched, and seized on November 30, 2014, and that drugs had already been

found in the car. (Doc. No. 104 at 12–13; *see also* Doc. No. 99 at 20.) That contention,

like Oliver's other contentions in support of a *Franks* hearing, is based on a misreading of

the record. First, the warrant affidavit does indeed indicate that the BMW had been

stopped on November 30, 2014, and then taken to an impound lot. (*See* Gov't Ex. 1 at 1–

2.) Second, while the affidavit does not mention that the BMW was searched prior to its

impoundment, that omission is immaterial because, contrary to Oliver's assertions, no

drugs were actually found in and recovered from the car until after the search warrant

was obtained. The roadside search of the BMW did yield a positive canine alert for the

possible presence of narcotics, but no drugs were actually discovered and seized from the

car before the police obtained a warrant to search it. (*See* Tr. at 84–85, 96–97, 99.) And

the supporting affidavit's failure to mention the canine alert is not a material omission

whose inclusion would have detracted from a finding of probable cause. Rather than

undermining a probable-cause finding, including information about the canine alert

would have added additional grounds for suspecting that the BMW contained contraband.

In sum, the omissions cited by Oliver are either not supported by the record, are affirmatively belied by the record, or are immaterial to the existence of probable cause. Accordingly, he has not made the "substantial preliminary showing" needed to warrant a *Franks* hearing.[13]

## D.   The Seizure of Cell Phones from Oliver's Hotel Room

Finally, Oliver seeks to suppress evidence obtained from the cell phones seized by the police while executing the warrant to search his hotel room. (Doc. No. 99 at 2, 10–11.) He contends that the phones were seized pursuant to his unlawful, warrantless arrest and were outside the scope of the search warrant. (*Id.* at 10–11, 30–31.)

As an initial matter, the record indicates that no cell phones were recovered from Oliver's person following his arrest in the hotel room. Instead, all five of the cell phones seized during the execution of the search warrant were found on the hotel room bed. (*See* Gov't Ex. 5 at 6.) So far as the record shows, the only items seized from Oliver's person

---

[13]      In addition to Oliver's failure to meet his initial burden under *Franks*, his motion for a *Franks* hearing is also untimely. Per the Court's amended scheduling order, all motions in this case had to be filed by July 6, 2015. (Doc. No. 30, Am. Scheduling Order ¶ 3.) Although Oliver's amended motion to suppress evidence appeared to raise a *Franks* issue (*see* Doc. No. 74 at 1, 10), he subsequently acknowledged at the motions hearing that he had not formally moved for a *Franks* hearing and confirmed that he was not raising a *Franks* issue at that time. (*See* Tr. at 26–27.) Despite those representations, and despite the fact that the parties' post-hearing briefs were limited to the suppression issues actually addressed at the hearing, Oliver's post-hearing brief attempted to raise a *Franks* issue. (*See* Doc. No. 99 at 16–20.) Oliver later filed a motion for a *Franks* hearing on September 1, 2015, well after the July 6, 2015 deadline had expired. And he did so without requesting an extension of the motions' deadline based on a showing of good cause. *See* Fed. R. Crim. P. 16(b)(3)–(4) (providing that the Court must issue a scheduling order that "limit[s] the time to join other parties, amend the pleadings, complete discovery, and file motions," and that the order "may be modified only for good cause and with the judge's consent").

were cash, a driver's license, and credit cards, none of which the government intends to introduce in its case-in-chief at trial. (*See id.*; Tr. at 33–34.) Oliver's request to suppress evidence seized pursuant to his arrest is therefore moot, obviating any need for this Court to consider the legality of his arrest.[14]

With regard to Oliver's remaining argument, the search warrant for the hotel room specifically authorized the seizure of narcotics, proceeds from the sale of narcotics, and "[d]ocuments, mails, keys, address books, notes, receipts, ledgers, photographs, and *other media*" indicative of criminal activity. (Gov't Ex. 5 at 5) (emphasis added). The parties dispute whether "media" includes the five cell phones seized by the police from the hotel room bed. Oliver argues that "[m]edia refers to items such as disc drives, CDs, and information utilized by computers," not cell phones. (Doc. 103 at 31.) The government responds that Oliver's argument "ignores the reality that cell phones are mini computers" that can store address books, photographs, and notes, meaning that the cell phones were "within the scope of the warrant whether specifically listed or not." (Doc. No. 108 at 17–18.)

This Court need not decide whether cell phones qualify as "media," either as a matter of general English usage or within the specific confines of the search warrant,

---

[14]     This Court nevertheless notes that, even if the issue had to be resolved in deciding Oliver's suppression motion, it would conclude that the arrest was lawful because, as previously explained, there was ample probable cause to believe that Oliver was involved in drug trafficking. *See Fagnan v. City of Lino Lakes, Minn.*, 745 F.3d 318, 324–25 (8th Cir. 2014) (explaining that officers may, during the execution of a search warrant, conduct a warrantless arrest if there is probable cause to believe that the arrestee has committed a crime).

because the validity of the cell phones' seizure does not ultimately hinge on that question. The reason is twofold. First, officers do not necessarily exceed the scope of a search warrant by seizing items that are not specifically mentioned in the warrant, so long as those items may contain things that are. In *United States v. Gamboa*, 439 F.3d 796 (8th Cir. 2006), officers obtained a warrant to search a particular location for "firearms, items related to the possession of firearms, indicia of occupancy, records of the use or purchase of controlled substances, and computer hardware, software, and accessories." *Id.* at 805. Although officers later seized several cell phones, which were not mentioned in the warrant, the Eighth Circuit held that the seizure did not exceed the scope of the warrant because "cell phones may well contain 'records of the use and purchase of controlled substances.'" *Id.* at 807. The same is true here. The cell phones seized from Oliver's hotel room, though not themselves mentioned in the search warrant, may well contain "[d]ocuments, . . . address books, notes, receipts, ledgers, [or] photographs" related to drug trafficking, all of which were specified in the warrant.

Second, even if the officers had exceeded the scope of the search warrant when they seized the cell phones, those seizures were otherwise permissible under the plain-view exception to the Fourth Amendment's warrant requirement. Under that exception, police may seize an object without a warrant if they "are lawfully in a position from which they view [the] object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Despite its name, the "immediately apparent" requirement does not require that the police know with any degree of certainty that "certain items are

contraband or evidence of a crime," but only that they possess probable cause to believe that they "may be contraband or stolen property or useful as evidence of a crime." *Texas v. Brown*, 460 U.S. 730, 741–42 (1983); *see also United States v. Weinvender*, 109 F.3d 1327, 1330 (8th Cir. 1997) ("The 'immediately apparent' requirement means that officers must have probable cause to associate the property with criminal activity.") (quotation omitted). The plain-view doctrine reflects the fact that, once a lawful search is underway, "it would often be a needless inconvenience, and sometimes dangerous—to the evidence or to the police themselves—to require [the police] to ignore [a piece of evidence] until they have obtained a warrant particularly describing it." *Coolidge v. New Hampshire*, 403 U.S. 443, 467–68 (1971); *accord Brown*, 460 U.S. at 739.

Officers were lawfully present in Oliver's hotel room pursuant to a search warrant when they observed the cell phones in plain view on the bed. The incriminating character of the cell phones would have been immediately apparent to the police, as they had probable cause to believe that the phones were connected to drug-trafficking activity. Prior to the execution of the warrant, Williams told the police that Oliver supplied him with a cell phone to use for narcotics-related business and phoned him to discuss the cocaine transported in his BMW. (*See* Gov't Ex. 2 at 3; Gov't Ex. 6 at 2.) In addition, the simultaneous presence of five cell phones on the hotel room bed was inherently suspicious, particularly in light of the generally known fact that cell phones are often tools of the drug trade. *See United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir. 2010) ("[D]rug traffickers typically carry multiple cell phones to allow for the disposal of one or more, if necessary to avoid detection."); *Lazcano-Villalobos*, 175 F.3d

at 844 ("[C]ellular telephones are recognized tools of the drug-dealing trade."); *De La Cruz*, 996 F.2d at 1311 (describing cell phones as "well known tools of the drug trade"). Because the officers, immediately upon seeing the cell phones in plain view, would have had probable cause to suspect that they might contain evidence of a drug-trafficking crime, they were authorized to seize the cell phones without a warrant under the plain-view doctrine.[15] *See United States v. Delva*, 13 F. Supp. 3d 269, 276 (S.D.N.Y. 2014) (noting that courts have routinely upheld the warrantless, plain-view seizures of cell phones "in the context of narcotics conspiracies, based on knowledge that the phones may contain contacts and other evidence of a crime"); *United States v. Lisbon*, 835 F. Supp. 2d 1329, 1363 (N.D. Ga. 2001) (concluding that cell phones found in plain view were properly seized without a warrant because "cell phones are 'a known tool of the drug trade'") (quoting *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990); *United States v. Santillan*, 571 F. Supp. 2d 1093, 1100–01 (D. Ariz. 2008) ("[C]ell phones and pagers in drug-trafficking investigations may come within the plain view exception to the warrant requirement as items akin to contraband, in that they are often tools of the drug-trafficking trade.").

---

[15]     Oliver cites *Riley v. California*, — U.S. —, 134 S. Ct. 2473 (2014), for the proposition that the police may never seize a cell phone without a warrant. (*See* Doc. No. 99 at 10, 30.) *Riley* stands for no such thing. In *Riley*, the Supreme Court held that while officers may *seize* a cell phone incident to a person's arrest, they generally must secure a warrant before searching its contents. 134 S. Ct. at 2485–86. That is precisely what the police did in this case. They lawfully seized the cell phones pursuant to either the hotel room search warrant or the plain-view doctrine, and then obtained a warrant to search the data stored on those phones.

### III.  Green's Motions to Suppress Evidence and Statements

Defendant Green moves to suppress the cell phone seized incident to his arrest and the custodial statement he subsequently gave to law enforcement on December 3, 2014. (Doc. No. 100, Green's Memo. in Supp. of Mot. to Suppress Evid. 3–7.)

### A.      Green's Arrest

Green contends that his arrest was not supported by probable cause and, thus, that the cell phone seized incident to that arrest must be suppressed under the Fourth Amendment. (*Id.* at 3–5, 7.) He maintains that, at the time of his warrantless arrest, law enforcement only had information that he was present when narcotics were allegedly packaged by Oliver, not that he "knew narcotics were being packaged," "saw narcotics being packaged," or "knew that the packages he and Williams took to the post office contained narcotics." (*Id.* at 4.) Green argues that such "mere presence . . . is insufficient to establish membership in a conspiracy" and, thus, that the police lacked probable cause to believe that he had committed a crime. (*Id.* at 4–5.)

Under the Fourth Amendment, the police may conduct a warrantless arrest if there is probable cause to believe that the arrestee has committed a crime. *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014). "Probable cause exists when a police officer has reasonably trustworthy information that is sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). Once a lawful arrest is made, officers may automatically search the arrestee's person and seize any items found. *See United States v. Robinson*, 414 U.S. 218, 224 (1973).

This Court concludes that the police had probable cause to believe that Green was involved in drug trafficking and, thus, were authorized to arrest him and seize his cell phone incident to that lawful arrest. As already explained with respect to Oliver's challenges to the existence of probable cause, the police had reasonably trustworthy information from both the CI and Williams that Green had mailed packages of cocaine on Oliver's behalf, including one of the two packages intercepted by postal inspectors, and that Green was present when Oliver packaged the four kilograms of cocaine that were ultimately intercepted. (*See* Gov't Ex. 2 at 2; Gov't Ex. 6 at 2; Tr. at 78–81, 104–05, 108–09.) The police had also found six kilograms of cocaine in Oliver's BMW along with a receipt for new tires in Green's name dated just two days before the BMW was stopped and seized. (*See* Gov't Ex. 1 at 5; Gov't Ex. 2 at 2–3; Tr. at 100.) Green's arrest was not, as he claims, based solely on his alleged presence when Oliver was packaging cocaine; instead, the police also knew that he mailed one of the intercepted packages of cocaine and purchased new tires for Oliver's BMW shortly before it was caught transporting narcotics.

Furthermore, Green's presence when the cocaine was packaged was alone sufficient to establish probable cause to support his arrest. Green's "mere presence" argument relies on the Eighth Circuit's decision in *United States v. Ruiz-Zarate*, 678 F.3d 683, 690 (8th Cir. 2012), which held that "a defendant's mere presence, coupled with the knowledge that someone else who is present intends to sell drugs," is insufficient to *support a conviction* for conspiring to distribute drugs. Probable cause, however, does not demand the same level of proof required to sustain a conviction, but only a "reasonable

ground for belief of guilt." *Pringle*, 540 U.S. at 371 (quotation omitted); *see also Gates*, 462 U.S. at 235 (explaining that probable cause "means less than evidence which would justify condemnation" or "the *quanta* of proof" required in "formal trials," as "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause") (quotations and alterations omitted). And presence alone may provide a sufficient ground for belief in guilt where it occurs under circumstances that support a reasonable inference of participation in criminal activity. *See Pringle*, 540 U.S. at 371–72 (holding that officers had probable cause to arrest one of three occupants of a car, which was found to contain "$763 of rolled-up cash in the glove compartment" and five bags of cocaine "behind the back-seat armrests," because it was reasonable to infer from these facts alone that "any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine"); *United States v. Clark*, 754 F.2d 789, 791–92 (8th Cir. 1984) (explaining that while "mere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause to arrest," presence under circumstances where it is reasonable to conclude that the defendant "was aware of the criminal nature of the transaction" is enough).

As the Ninth Circuit has explained, "association with persons engaging in criminal activity" may give rise to probable cause where there are "some additional circumstances from which it is reasonable to infer participation in criminal enterprise," including where "the known criminal activity was contemporaneous with the association" or where "the nature of the criminal activity is such that it could not normally be carried on without the knowledge of all persons present." *United States v. Hillison*, 733 F.2d 692, 697 (9th Cir.

1984). Green's presence while Oliver was packaging cocaine, not to mention his alleged mailing of one of those packages, was sufficient by itself to support a reasonable inference that he was aware of the illicit contents of those packages and, thus, a knowing participant in drug trafficking. *See Pringle*, 540 U.S. at 371–72 (holding that where a defendant was a passenger in a car containing bags of cocaine, it was "an entirely reasonable inference" to believe that he "had knowledge of . . . the cocaine"). Because the police had probable cause to arrest Green for his suspected involvement in drug trafficking, they were entitled to seize the cell phone found on his person incident to his lawful arrest.

**B.   Green's Custodial Statements**

Green also moves to suppress his post-arrest statements to the police, claiming that the interviewing officers violated his Fifth Amendment right to remain silent when they continued to question him after he said he was "done talking." (Doc. No. 100 at 5–6.)

"[O]nce a person in custody has invoked his right to remain silent, admissibility of any subsequent statements depends on whether his 'right to cut off questioning' was 'scrupulously honored.'" *United States v. Sawyer*, 588 F.3d 548, 554 (8th Cir. 2009) (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)). Police, however, are only required to cease questioning if the defendant has unequivocally invoked his Fifth Amendment right "through a clear, consistent expression of a desire to remain silent." *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007) (quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989)). "Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are

not enough," nor is "[b]eing evasive and reluctant to talk." *Id.* In determining whether a defendant has unambiguously invoked his right to remain silent, his statements must be considered as a whole. *Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001). If a reasonable officer confronted with a defendant's statements, taken as whole, "would have understood only that the suspect *might* be invoking" his right to remain silent, the Fifth Amendment does "not require the cessation of questioning." *See Davis v. United States*, 512 U.S. 452, 459 (1994).

On December 3, 2014, Green was interviewed at the Hennepin County Jail by Sergeant Biederman and Officer Evans. (*See* Gov't Ex. 7.) At the outset of the audio-recorded interview, Green was advised of his *Miranda* rights, stated that he understood them, and began answering the officers' questions. (*Id.*) Approximately five minutes into the eighteen-minute interview, and after Green was confronted with the evidence against him, the following exchange took place:

> Biederman:   The only thing I want from you is the truth. I know that you're not the kingpin of this operation . . . . This is the one time we're coming to talk to you. You have some serious life choices to make, Jimmy. . . . You need to think about this and think about your answers very carefully.
>
> Green:   Man, I'm done talking. I ain't talking no more anyway.[16] I can go back to my cell. Whatever I did . . . .

---

[16]   The audio recording of Green's interrogation is often murky, making it difficult to discern precisely what is being said. It is therefore not entirely clear whether Green actually stated that he was "done talking" and "ain't talking no more anyway." Green maintains that he said the former, but has not otherwise transcribed any part of his interview. (*See* Doc. No. 100 at 5–6.) The government's attempt to transcribe the relevant portions of the interview does not acknowledge that Green said he was "done talking," instead referring to that specific segment of the audio recording as unintelligible. (*See*

(Footnote Continued on Next Page)

Evans:        [Interrupting] How old are you Jimmy?

Green:        I'm sixty six and I ain't trying nothing . . . . I know everybody
              here, whatever I know it ain't got nothing to do with me
              doing nothing cuz I ain't got . . .

Evans:        [unintelligible]

Biederman:    This is going to make more sense to you when we drive you
              over to the U.S. Marshals and you see you're in federal court.

Green:        Well, what you saying then? What do you have to say then?

Biederman:    I want to know . . .

Green:        Ain't nothing to say. Ain't nothing to know then, if you say
              you know everything, why am I in here?

Biederman:    So you can cooperate.

Green:        Cooperate how?

Biederman:    Who's this guy [showing Green a photograph]?

Green:        Who do you care who he is? You just showed me a picture,
              you all got to know who they are. Why you asking me double
              questions? You know who he is, you know who he is, you
              know who he is, you know who he is, so what's the problem?

For the remainder of the interview Green continued to answer the officers' questions

without expressing any desire to remain silent. (*Id.*)

---

(Footnote Continued from Previous Page)
Doc. No. 109 at 6.) This Court has done its best to parse the audio recording and has
given Green the benefit of the doubt when construing his statements to the interviewing
officers. Further analysis of the audio recording with sophisticated software that is not
readily available to this Court may better reveal what Green actually said during the
interview.

Green's statements, taken as a whole, did not express a clear, consistent, and unambiguous desire to remain silent, one sufficient to unequivocally invoke his Fifth Amendment rights and require the police to cease further questioning. Had Green said nothing more than "I'm done talking," his statements might be interpreted as expressing a clear and unambiguous desire to remain silent. That, however, is not all that Green said and did. Green continued to talk about his involvement in the alleged drug conspiracy, stating "Whatever I did . . . ," only to be interrupted by Officer Evans' question regarding his age. After answering that question, Green kept talking without further prompting and suggested that the reason he had "nothing to say" was because the drug conspiracy had "nothing to do with [him]" and the police already "kn[e]w everything." Statements like these are not sufficient to clearly and unambiguously invoke one's right to remain silent, and they cast sufficient doubt on whether Green, despite his earlier statements, was actually invoking his right to remain silent or simply indicating that he had nothing to say because he was not involved in the drug conspiracy. *See Fare v. Michael C.*, 442 U.S. 707, 727 (1979) (explaining that a juvenile's statements "that he could not, or would not, answer the question . . . were not assertions of his right to remain silent"); *Simmons*, 235 F.3d at 1131 ("A denial of knowledge does not constitute an assertion of the right to remain silent."); *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995) (holding that a defendant's statements that he did not "need to say anything" because the police had "all the evidence against [him]" fell "far short of a clear or unequivocal expression of the right to remain silent"). Indeed, Officer Evans testified at the evidentiary hearing that she

and Sergeant Biederman continued to question Green because "he kept talking to us."
(Tr. at 112.)

A reasonable officer faced with Green's statements, taken as a whole, "would have understood only that [he] *might* be invoking" his right to remain silent, not that he was actually doing so. *See Davis*, 512 U.S. at 459; *see also Thompson*, 866 F.2d at 271–72 (holding that a defendant did not clearly and consistently invoke his right to remain silent where, after requesting that questioning be deferred until tomorrow, he effectively reversed that request by continuing to talk); *United States v. Williams*, 690 F. Supp. 2d 829, 836 (D. Minn. 2012) (holding that a defendant did not unequivocally invoke her right to remain silent where, after she stated "'I'm done answering questions, I'm sorry, goodbye,'" she "quickly launche[d] into a monologue explaining her situation and claiming "'I didn't do anything'"). While it may have been prudent for the police to seek to clarify whether Green wished to invoke his right to remain silent, "[t]he police are not required to . . . ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). Because Green's statements as a whole did not clearly, consistently, and unambiguously invoke his right to remain silent, the police were not required under the Fifth Amendment to terminate the interrogation.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Defendant Houston Oliver's Amended Motion to Suppress Evidence (Doc. No. 74) and Motion for a *Franks* Hearing (Doc. No. 103) be **DENIED**; and

2.     Defendant James Green's Motion to Suppress Evidence (Doc. No. 54), Motion to Suppress Statements (Doc. No. 55), and Supplemental Motion to Suppress Evidence (Doc. No. 81) be **DENIED**.

Date:  October 13, 2015

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **October 27, 2015**. A party may respond to those objections within **fourteen days** after service thereof. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.